## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LUZ E. SKELCHER,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 3:21-cv-00018 (VLB)** |
| | : | |
| **THE STATE OF CONNECTICUT,** | : | |
| **DEPARTMENT OF CORRECTION,** | : | **November 12, 2021** |
| **Defendant.** | : | |
| | : | |

### MEMORANDUM OF DECISION GRANTING-IN-PART DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT IN PART, [ECF NO. 17]

Before the Court is a Motion to Dismiss portions of the Plaintiff Luz E. Skelcher's Complaint, [ECF No. 1], pursuant to Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6), brought by Defendant State of Connecticut, Department of Correction ("DOC" or "Defendant").  [ECF No. 17].

Specifically, Defendant moves to dismiss portions of Count One of Plaintiff's Complaint, sounding in discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, under Federal Rule of Civil Procedure 12(b)(6).  Defendant so moves because of Plaintiff's failure, in part, to exhaust her administrative remedies, and because some of Plaintiff's allegations are untimely, do not constitute adverse employment actions, and/or are not alleged to have occurred on the basis of race or gender.  [ECF No. 17-1 at 6-12].

Defendant further moves to dismiss Count Two (alleged discrimination under the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen.

Stat. § 46a-60, *et seq.*) under Federal Rule of Civil Procedure 12(b)(1) as barred by the Eleventh Amendment and the doctrine of sovereign immunity and under Federal Rule of Civil Procedure 12(b)(6) for Plaintiff's failure to exhaust her administrative remedies pursuant to Conn. Gen. Stat. § 46a-82(f).  [ECF No. 17-1 at 12-21].  Finally, Defendant moves to dismiss Counts Three (state law claim alleging negligent supervision) and Four (state law claim alleging intentional infliction of emotional distress) under Federal Rule of Civil Procedure 12(b)(1) as barred by the Eleventh Amendment and the doctrine of sovereign immunity. [ECF No. 17-1 at 21-29].

For the reasons set forth herein Defendant's Motion to Dismiss Plaintiff's Complaint in Part will be GRANTED-IN-PART.

## I. LEGAL STANDARD

### A.    Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can

choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## II. ALLEGATIONS

In reviewing a motion to dismiss, the Court considers the allegations of the complaint to be true. *Hayden*, 594 F.3d at 161.

3

"Plaintiff is a Hispanic female" with "over sixteen (16) years['] experience [as an employee of] the defendant."  [ECF No. 1 (Complaint) ¶¶ 8, 11].  "For the entirety of her career with the defendant DOC, until February, 2020, the plaintiff has been posted to Corrigan-Radgowski Correctional Center, located in Uncasville.  The plaintiff was one of only two female Hispanic Correction Officers at that facility, the second having only recently been hired less than one year prior to the commencement of the instant action."  *Id.* ¶ 12.

"[O]n February 3, 2011, there was a bad snow storm.  The plaintiff received a phone call from a fellow Correction Officer who asked if the plaintiff would pick her up because she could not drive in the snow.  The plaintiff picked up the C/O at her home and arrived at work while Roll Call was in progress.  After taking her post, Lt. Palmer called the plaintiff to the Lieutenant's office and presented her with a two minute late slip.  The plaintiff explained that she had picked up her fellow C/O on her way in.  The Lieutenant nevertheless proceeded to present the plaintiff with a late slip.  Many times other C/Os who are not Hispanic females have been late by ten, twenty, even thirty minutes, and were not given late slips. Lt. Palmer is a supervisory agent of the defendant DOC.  Palmer is a white, non Hispanic male."  *Id.* ¶¶ 17-19.

"On September 25, 2012, the plaintiff was posted in A Pod with Officer Field.  The plaintiff's then boyfriend worked in the position of A/C Rover at the facility.  During down time he would come to plaintiff's unit, which is common

practice among Rovers.  Lt. Colvin, a supervisory agent of the defendant DOC, prohibited the plaintiff's boyfriend from doing so.  The plaintiff asked Lt. Colvin why he forbade her boyfriend from coming to the unit, when others [sic] Rovers were allowed to do so.  The plaintiff pointed out that many couples are allowed to work together at the facility and are not separated.  Colvin stated, 'That's different'.  Lt. Colvin, is a white, non Hispanic male."  *Id.* ¶¶ 20-22.

"In 2012, . . . [t]he plaintiff was posted as F/H Rover (West Side responder) while in F-Pod.  C/O McKenna (East Side responder) was present.  Lt. Palmer gave the plaintiff a direct order to help East Side feed.  The plaintiff stated that she was a West Side responder.  Officer McKenna informed Lt. Palmer that he would do it because he's the East Side responder.  Lt. Palmer insisted that the plaintiff go to the East Side.  The plaintiff asked Lt. Palmer why he was making her do work not pertaining to her post, particularly when the proper C/O for that post, McKenna, was present.  Palmer could give the plaintiff no valid reason, and simply stated that he did not want to 'argue' with her, and said, 'just do what I tell you to do.'"  *Id.* ¶ 23.

"On March 6, 2015, [Plaintiff's] five day post for this rotation was Hall 2 (AP).  The plaintiff was pulled out of her 5 day post and was posted in B Pod (gang block) so that a C/O from another shift could receive overtime that otherwise would have gone to the plaintiff.  The C/O is a white, non Hispanic male and has less seniority than the plaintiff."  *Id.* ¶ 24.

5

"When there is a death in the family of an employee, the defendant acknowledges the loss and extends support to the affected employee.  When Hurricane Maria hit Puerto Rico in October, 2017, the plaintiff's brother went missing.  Through her efforts and contact with hospitals in Puerto Rico and Sciencia Ferensis, the plaintiff learned that her brother's body was found.  The plaintiff informed her Supervisor that she had to fly to Puerto Rico to identify her brother's body.  When the plaintiff returned from identifying his body and organizing his cremation, the plaintiff did not receive any recognition from the defendant, and it made no mention of or offered any support to her regarding this tragic time."  *Id.* ¶ 25.

"A posting in the Lobby brings a C/O into direct contact with the public.  On an occasion where the plaintiff was posted in the Lobby, Captain Penn had her relieved by Officer Diane Finney, and the plaintiff was put in A block.  The plaintiff asked Captain Penn why she was pulled off of her post.  Penn stated that the plaintiff should not have asked a visitor to take off their shoes before walking through the metal detector.  Captain Penn claimed that she thought that the plaintiff's 'strengths were in A block,' to wit, away from contact with the public. The plaintiff informed Captain Penn that the plaintiff was directed by a supervisor to require that the visitor walk through the metal detector in order to enter the facility.  Captain Penn refused to listen to the plaintiff.  The plaintiff was informed by Lt. Butler that Captain Penn gave all Lieutenants orders to never post the

plaintiff in the Lobby again.  Captain Penn is a supervisory agent of the defendant DOC, and is a black non Hispanic female.  C/O Finney is a white, non Hispanic female."  *Id.* ¶¶ 26-29.

"In 2018, The plaintiff became aware of an upcoming opening in the Phone Room post on first shift.  Her bilingual skills would be beneficial to the defendant DOC in that position.   The plaintiff indicated her interest, and Deputy Warden Carlos agreed, stating that she wanted me to be part of her team at Radgowski.  Deputy Warden Carlos is a black female.  It is common practice at the defendant DOC for Supervisors to offer posts to qualified officers without the C/O's [sic] making formal application for the position.   The appointment is made and announced at roll call.  The plaintiff was told the post was to be hers.  Thereafter, Captain Shabenas and Captain Korch learned that the plaintiff was getting the post.  Captain Shabenas and Captain Korch were angry that the post was to go to her, and prevented it from happening.  Captain Shabenas and Captain Korch are Supervisory agents of the defendant DOC.  Captain Shabenas and Captain Korch are white non Hispanic males."  *Id.* ¶¶ 31-33.

"On November 5, 2018, the defendant DOC announced that promotions would be made statewide. . . . Thirty-six officers from Corrigan/Radgowski were Strongly Recommended, comprised of thirty-two males and four females.  Of the four females, two are white, one is black and one, the plaintiff, is Hispanic."  *Id.* ¶¶ 34-35.

7

"On June 20, 2019, the defendant promoted eight C/O's from the plaintiff's then facility to Lieutenants.  Those promoted, their race, gender and seniority are as follows:

1- Daniel Melton, white male, hired 3/31/2006, 13 years employment;

2- Jamilee Dousis, white female, hired 11/10/2006, 12 years employment;

3- Anthony Jusseaume, white male, hired 4/25/2008, 11 years employment;

4- Michael Greene, white male, hired 9/12/2008, 11 years employment;

5- Jonathan Peau, samoan male, hired 12/17/2010, 9 years employment;

6- Camelia Daniels, black female, hired 12/13/2013, 6 years employment;

7- Benjy Nichols, black male, hired 12/2/2011, 8 years employment;

8- Kervin Ocasio, hispanic male, hired 3/12/2007, 12 years employment.

Two additional C/O's, transfers from other facilities, were promoted.  They are one white male and one black male."  *Id.* ¶¶ 36-37.

"During the promotional process, everyone else promoted by the defendant had a proper, in person interview in front of Lieutenants, Captains and the Deputy Warden.  The plaintiff did not.  The plaintiff received a telephone call from Captain Donovan, a white, non Hispanic female and supervisory agent of the defendant DOC.  The plaintiff was never asked to come in for a proper, in person interview.  The plaintiff was not promoted by the defendant.  All of the C/O's who were promoted by the defendant have less time and less experience than the

plaintiff.  None of the C/O's who were promoted by the defendant are Hispanic females." *Id.* ¶¶ 38-40.

"The plaintiff complained to Human Resources and . . . contacted her union steward seeking help.  The plaintiff even explored getting a hardship transfer out of the facility which she had worked in for her entire career.  The plaintiff contacted the facility warden, Anthony Corcella.  The plaintiff contacted him twice, leaving messages for him with his secretary.  Corcella did not responded [sic] to the plaintiff, and she has never heard from him.  The warden, Anthony Corcella, is a Supervisory agent of the defendant DOC.  Corcella is a white, non Hispanic male." *Id.* ¶¶ 43-44.

"Among her other complaints, the plaintiff complained directly to Deputy Warden Cotta about . . . being passed over for promotion.  Rather than assisting her in any way, the Deputy Warden barked at the plaintiff threateningly, demanding to know if she was 'Questioning [his] decision?'  The Deputy Warden appeared very angry that the plaintiff complained to him.  The plaintiff respectfully stated, 'No sir,' and inquired of Cotta.  'What did I do wrong or where was I lacking that I was passed over for promotion?'  Cotta admitted that 'You did nothing wrong.'  He further admitted that not all qualified candidates get promoted.  Cotta stated, 'You do realize not everyone gets promoted.'  Deputy Warden Cotta is a supervisory agent of the defendant DOC.  Cotta is a white male." *Id.* ¶¶ 46-47, 49.

"On September 12, 2019, the defendant promoted again from the previous list.  The defendant promoted another white, non Hispanic male, and the only other female, a white, non Hispanic female.  Both have less seniority than the plaintiff.  Once again, the defendant DOC passed the plaintiff over for promotion." *Id.* ¶¶ 50-51.

"On February 2, 2020, the plaintiff transferred to Brooklyn Correctional. . . . Since then, the plaintiff was subjected to discipline in retaliation for her complaints about the discrimination against her.  The defendant DOC imposed a ten (10) day suspension upon the plaintiff, and mandated that she submit to remedial training.   The lengthy suspension is substantially harsher than discipline imposed upon similarly situated persons not of her protected classes, who have not complained about misconduct based thereon.  The purpose of the discipline, in addition to retaliation, is to threaten and intimidate the plaintiff to stop complaining, and to create a record to further falsely discipline her, with the intent of terminating the plaintiff." *Id.* ¶¶ 53, 56-58.

## III.  DISCUSSION

As an initial matter, Plaintiff concedes, in opposition to Defendant's Motion to Dismiss, that Counts Two through Four, alleging state law claims of discrimination under the CFEPA, negligent supervision, and intentional infliction of emotional distress, respectively, may be dismissed.  [ECF No. 23 at 1 ("As to the defendant's arguments regarding Counts Two, Three and Four based upon

sovereign immunity and Eleventh Amendment immunity, the plaintiff does not contest these assertions, and requests that Counts Two, Three and Four be dismissed without prejudice.")].

The Eleventh Amendment "provides immunity for states against suits in federal court." *Gibson v. State of Conn. Jud. Dep't*, No. 3:05-cv-01396 (JCH), 2006 WL 1438486, at *2 (D. Conn. May 23, 2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)). "A state may be subject to suit in federal court one of two ways: (1) Congress can divest a state of immunity through statutory enactment, as it has done with Title VII; or (2) a state may waive its immunity and agree to be sued in federal court." *Sanchez v. Univ. of Conn. Health Ctr.*, 292 F. Supp. 2d 385, 392 (D. Conn. 2003) (citing *Close v. N.Y.*, 125 F.3d 31, 39 (2d Cir. 1997)).

"With respect to Plaintiff's CFEPA claims in Count T[wo], it is well-established that the State of Connecticut has not waived its Eleventh Amendment immunity from CFEPA suits in federal court." *Owoeye v. Conn.*, No. 3:14-cv-00664 (VLB), 2016 WL 1089179, at *4 (D. Conn. Mar. 18, 2016) (citing cases); *see also Walker v. Conn.*, 106 F. Supp. 2d 364, 370 (D. Conn. 2000) (Burns, J.) (noting that "the wording of [CFEPA] ... is the antithesis of the clear declaration mandated by Great Northern" that the State has waived immunity) (cited by *Owoeye*, 2016 WL 1089179, at *4).

11

"The Eleventh Amendment similarly bars Plaintiff's state law claim [for intentional] infliction of emotional distress."   *Owoeye*, 2016 WL 1089179, at *4 (citing *Dragon v. Conn.*, No. 3:14-cv-00749 (MPS), 2014 WL 6633070, at *3 (D. Conn. Nov. 21, 2014)).   "Similarly, [Plaintiff's] remaining . . . common law claim[ for]—negligent . . . supervision . . .—[is] barred by the Eleventh Amendment." *Dragon*, 2014 WL 6633070, at *3.

Defendant's Motion to Dismiss is GRANTED as to the unopposed portion of the Motion seeking dismissal of Plaintiff's CFEPA and common law claims. Counts Two, Three and Four of the Complaint are DISMISSED.[1]

A. Count One (Title VII Discrimination, Hostile Work Environment, and Retaliation)

Defendant argues first that "[o]nly events that occurred during the 300-day period prior to filing [a complaint with] the EEOC are actionable under Title VII, [and therefore t]he Title VII claims are untimely for any actions prior to January 4, 2019, which is 300 days prior to filing her complaint with the Commission on Human Rights & Opportunities ('CHRO')."   [ECF No. 17-1 at 6 (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996); *Roberts v. Jud. Dep't*, No. 3:99-cv-00014 (RNC), 2001 WL 777481, at *3 (D. Conn. Mar. 28, 2001))].

---

[1] Plaintiff requests that these claims be dismissed "without prejudice for the purpose of pursuing the claims in state court."   [ECF No. 23 at 1-2].  The Court dismisses these claims on Eleventh Amendment immunity grounds alone and makes no assumptions about and expressly does not decide whether the other grounds for dismissal argued in Defendant's motion have merit.   Therefore, whether Plaintiff can now proceed on these claims in state court is not before the

Plaintiff's claims for allegedly discriminatory adverse employment events, such as on September 25, 2012, when her boyfriend was not allowed to visit her while she was working, and others that allegedly occurred prior to January 4, 2019, are, therefore, untimely, Defendant argues.  Defendant also argues that "Plaintiff has not administratively exhausted the February 2, 2020 ten-day suspension" because it was not "fil[ed] with the CHRO or EEOC." "Accordingly," says Defendant, "the only timely [discrimination] claim that was administratively exhausted is the 2019 failure to promote claim."  [ECF No. 17-1 at 6-7].

Defendant argues further that the "continuing violation doctrine," which "provides that 'if a Title VII plaintiff files an Equal Employment Opportunity Commission charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone,'" does not save the untimely claims.  *Id.* at 7-8 (quoting *Chin v. Port Auth.*, 685 F.3d 135, 155-56 (2d Cir. 2012)).   This is because, Defendant argues, "[t]he continuing violations doctrine is limited in application and does not preserve untimely claims related to 'discrete, completed employment actions such as transfers.'"  *Id.* at 7 (quoting *Sundram v. Brookhaven Nat'l Labs.*, 424 F. Supp.2d 545, 560 (E.D.N.Y. 2006)).

---

Court and the Court declines to address that question.

Additionally, according to Defendant, the untimely claims suffer from two other deficiencies.  First, Plaintiff "has not set forth sufficient allegations to demonstrate that she suffered an adverse employment action" because the prior events must be "more disruptive than a mere inconvenience or an alteration of job responsibilities"; *i.e.*, they must be akin to "a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation," which they are not.  *Id.* at 8-9 (quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000)). Other, less severe employment actions do not meet the "adverse employment action" criteria, Defendant argues.  *Id.* at 9-10 (citing cases).

Second, the prior events do not meet the requirement for a *prima facie* case, Defendant argues, in that they did not "occur[] under circumstances giving rise to an inference of discrimination based on her race, color and/or gender."  *Id.* at 10.  This is because Plaintiff, in her prior events, has not alleged similarly situated comparators who were treated more favorably.  Thus, according to Defendant, "[s]ince the Plaintiff has only alleged similarly situated comparators in regard to the 2019 failure to promote claim, she has failed to state a claim in regard to any other adverse action."  *Id.* at 11-12.

Plaintiff counters that while many of the alleged incidents do, in fact, fall outside the 300-day window for administrative exhaustion, that does not matter

14

because the claims are alleged as part of Plaintiff's hostile work environment claim, and thus saved.  [ECF No. 23-1 at 24-28 ("[C]onsideration of the entire scope of a hostile [or discriminatory] work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period.") (quoting *AMTRAK v. Morgan*, 536 U.S. 101, 105 (2002)].

As regards the 10-day suspension that occurred after Plaintiff filed her EEOC/CHRO complaint, Plaintiff argues that "[c]laims not asserted before the EEOC, and which would thus be barred by the failure to timely exhaust may nevertheless by [sic] pursued in a subsequent civil action 'if they are reasonably related to those that were filed with the agency.'"  *Id.* at 28 (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003).  Plaintiff's claims are reasonably related to those filed with the EEOC, Plaintiff argues, because they are "(1) claims where the conduct complained of would fall within the scope of the EEOC investigation; (2) claims alleging retaliation by an employer against an employee for filing an EEOC charge; [or] (3) claims where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge."  *Id.* at 29 (citing *Butts v. N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993)).

As to Defendant's argument that Plaintiff's alleged events do not constitute adverse employment actions, Plaintiff disagrees, arguing that "[a]dverse employment actions can include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, *or other indices unique to a particular situation*.'"  *Id.* at 22 (quoting *Sanders v. N.Y. City Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir.2004) (emphasis in Plaintiff's Opposition)).   Plaintiff argues that the alleged incidents, for example her being ordered away from the front entrance of her facility back to inmate dormitories and being prevented from taking duty in the Phone Room, where she could have used her bilingual language skills, cannot simply be dismissed as not adverse, because "that simply is not the case."  *Id.* at 23.  "In each of the incidents listed," Plaintiff argues, "whenever the plaintiff complained about her mistreatment to her supervisors, including the Warden, she was brushed off, ignored and downright intimidated."  *Id.*

In addition, Plaintiff's alleged 10-day suspension should be reviewed under the more relaxed retaliation standard, which judges an event as adverse, Plaintiff asserts, if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 19 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)).  Here, Plaintiff argues, that standard is met.

16

Finally, Plaintiff states that she "has undisputably [sic] pled factual, nonconclusory direct evidence that plaintiff's race and color was the motivating factor for defendant's conduct." *Id.* at 15. This is so, Plaintiff asserts, because "[s]he has provided numerous and ample comparasions [sic] to non Hispanic female employees who engaged in identical behavior which was ignored or endorsed by the defendant when engaged in by anyone else, yet sanctioned and punished when done by the plaintiff." *Id.* at 22-23 (citing the front entrance and Phone Room examples).

Defendant Replies that while Plaintiff's 10-day suspension, which occurred after Plaintiff filed her EEOC/CHRO Complaint, was concededly a "materially adverse [employment] action, the Plaintiff failed to administratively exhaust that discrete act since *she did not add this allegation to her existing complaint which was not released until October 2020.*" [ECF No. 24 at 5 (emphasis in Defendant's Reply Brief)]. "Since the February 2020 suspension occurred while the *pending CHRO/EEOC* claim was being investigated," Defendant argues, "exhaustion of administrative remedies was required, at least by amendment of the pending matter." *Id.* (emphasis in Defendant's Brief). Defendant concedes that "[c]ourts have recognized an equitable defense to the exhaustion requirement where more recent allegations of discrimination are reasonably related to the discrimination about which the plaintiff has filed an earlier charge with the EEOC," *id.* (citing *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 386 (2d Cir. 2015)), but argues that

"since the DOC imposed a ten day suspension *eight months prior to the release of jurisdiction of the pending administrative complaint*, Plaintiff should have amended her pending administrative complaint, not file[d] a new complaint."  *Id.* at 5-6 (emphasis in Reply Brief) (citing *Soules v. Conn.*, 882 F.3d 52, 57 (2d Cir. 2018)).  Since she did not, "that claim should also be dismissed since it could have been administratively exhausted, but Plaintiff chose not to do so even while represented by counsel."  *Id.* at 6.

Defendant also replies that Plaintiff's untimely discrete acts are not saved as a hostile work environment because "Plaintiff's failure to promote or assign allegations," which are timely, "remain 'discrete' claims, as she has not alleged the requisite connection to her claims of retaliation."  *Id.* at 8 (citing *Mohamed v. NYU*, No. 14 Civ. 8373 (GBD) (MHD), 2015 WL 5307391, at *3-4 (S.D.N.Y. Sept. 10, 2015)).  "Thus, this Plaintiff has not set forth sufficient allegations to meet the pleading requirements of *Iqbal,* regarding the untimely and unexhausted alleged adverse actions."  *Id.* at 9.

1.    Discrimination

As an initial matter, Plaintiff cites an incorrect statement of law in setting forth the legal standard for the Court's consideration on a motion to dismiss. Plaintiff states that "[a] motion to dismiss can be granted only when 'it appears beyond a doubt' that a plaintiff fails to state any claim upon which relief may be granted."  [ECF No. 23-1 at 11-12 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46

(1957))].  **Not only does Plaintiff mis-quote this part of *Conley v. Gibson*, but more importantly, that case's holding regarding the legal standard on a motion to dismiss was abrogated in 2007 by the United States Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).   The *Conley* standard "was abandoned by the Court's later rulings in *Twombly* and *Iqbal*, which clarified the proper Rule 8 standard as being whether a complaint alleged 'enough facts to state a claim to relief that is plausible on its face,' *Twombly*, 550 U.S. at 570, such that a court could 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *EEOC v. Port Auth. Of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).**

**Plaintiff also quotes an in-District case from 1998 holding that "[d]ismissal may not be granted 'unless it is clear that <u>no relief could be granted under any set of facts</u> that could be proved consistent with the allegations.'"  [ECF No. 23-1 at 12-13 (citing *Feiner v. SS & C Techs.*, 11 F. Supp. 2d 204, 207 (D. Conn. 1998) (emphasis added)].  This case's holding is also inconsistent with *Twombly,* and Plaintiff's citation to these inapplicable standards of law that might potentially be more favourable to her case but that were overruled over a decade ago is troubling.**

**Second, also preliminarily, Plaintiff argues in her initial, 3-page "Objection" to Defendant's Motion to Dismiss that her untimely claims, *i.e.*, those that occurred more than 300 days prior to her filing her EEOC/CHRO Complaint, are**

saved by the continuing violation doctrine.   [ECF 23 at 2 ("The series of discriminatory actions against the plaintiff are timely, as both part of a continuing violation, as properly pled")].   However, in her "Memorandum in Opposition" to Defendant's Motion to Dismiss, she makes no argument regarding the same.   *See generally* [ECF No. 23-1 (no argument regarding continuing violation doctrine)]. Thus, Plaintiff has abandoned this argument.   *See Jackson v. Fed. Express Corp.*, 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").   In fact, Plaintiff expressly abandons this argument in her memorandum, arguing only that the untimely events may be considered as part of her hostile work environment claim, thereby impliedly conceding that they are untimely as regards her discrimination claim.   [ECF No. 23-1 at 24-28 ("[C]onsideration of the entire scope of a hostile [or discriminatory] work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period.") (quoting *AMTRAK v. Morgan*, 536 U.S. at 105)].   Therefore, Plaintiff's untimely allegations cannot be used to show Title VII discrimination by Defendant.

20

However, as to Plaintiff's February 2020 allegations of retaliation for her complaints regarding the 2019 elections where she was not promoted, the Court will allow that claim to proceed, as is proper "if [it is] reasonably related to those [claims] that were filed with the agency," *Deravin*, 335 F.3d at 200, or are claims "alleging retaliation by an employer against an employee for filing an EEOC charge." *Butts*, 990 F.2d at 1402-03; *Soules*, 882 F.3d at 57.  Here, Plaintiff filed her EEOC/CHRO Complaint on October 31, 2019, [ECF No. 17-2], and she alleges that Defendant retaliated against her in February 2020.  [ECF No. 1 ¶¶ 53, 56-58]. That claim passes muster as one reasonably related to her EEOC/CHRO complaint.

In sum, the Court agrees with Defendant that Plaintiff's allegations of discrimination prior to the 2019 failure to promote claim fail due to Plaintiff's failure to exhaust, but will allow Plaintiff's 2019 failure to promote claim and her February 2020 retaliation claim, which Defendant concedes was an adverse employment action, to proceed.

2.      Hostile Work Environment

A claim for hostile work environment requires allegations "that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Rivera v. Rochester Genesee Reg'l Transp. Auth*., 702 F.3d 685, 693 (2d Cir. 2012).  "The standard . . .

is a 'demanding one,' and a plaintiff must establish that the alleged harassment was 'offensive, pervasive, and continuous enough' to create an abusive working environment." *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584-85 (S.D.N.Y. 2008). "Among the factors to be considered in determining whether conduct is sufficiently hostile under the totality of the circumstances are: frequency; severity; whether the conduct is physically threatening or humiliating; and whether it interferes with an employee's performance." *De La Cruz v. Guilliani*, No. 00 Civ. 7102 (LAK) (JCF), 2002 U.S. Dist. LEXIS 19922, at *28-29 (S.D.N.Y. Aug. 23, 2002). In addition, a Plaintiff "must identify a 'specific basis . . . for imputing the conduct that created the hostile environment to the employer,'" *Chansamone v. IBEW Local 97*, 523 F. App'x 820, 823 (2d Cir. 2013) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)), and the Second Circuit "ha[s] allowed hostile environment claims to proceed only where a plaintiff has shown either one or more 'extraordinarily severe' incidents, *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000), or 'a steady barrage of opprobrious racial comments.'" *Chansamone*, 523 F. App'x at 823 (quoting *Schwapp*, 118 F.3d at 110).

As far as timeliness is concerned, the Court agrees with Plaintiff that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile

22

environment takes place within the statutory time period."  *AMTRAK v. Morgan*, 536 U.S. at 105.  However, it is critical that the act that has taken place within the statutory time period be one that "contribut[es] to that hostile environment."  *Id.*

Here, the one act that Plaintiff asserts is timely that provides the "hook" to bring in the other allegedly hostile acts was the 2019 failure to promote claim. But courts in this Circuit have held that failure to promote claims, like unlawful termination claims, are "discrete events" of discrimination rather than events contributing to a hostile work environment:

> [N]ot all discriminatory acts are part of the continuing violation. Discrete incidents of discrimination that are unrelated to the hostile work environment, 'such as termination, failure to promote, denial of transfer, or refusal to hire' cannot be part of a continuing violation and cannot supply the hook to bring an otherwise untimely hostile work environment claim into the 300 day time period. . . . Plaintiff's discriminatory termination claim is based on a discrete act, his termination, as opposed to the cumulative effect of many small hostile acts.  *See Rodriquez v. Cnty. of Nassau*, 933 F. Supp. 2d 458, 462 (E.D.N.Y. 2013) ('[T]ermination is a discrete act.'). . . . Here, plaintiff's discriminatory termination claim is a discrete discriminatory act and cannot be used as a hook to bring his hostile work environment claim within the 300 day period to file a charge with the EEOC.  Therefore, his hostile work environment claim was extinguished by his failure to timely bring an EEOC charge.

*Szuszkiewicz v. JPMorgan Chase Bank*, 12 F. Supp. 3d 330, 338-39 (E.D.N.Y. 2014).  The same situation exists here.  Defendant's failure to promote Plaintiff, if it was motivated by racial or gender animus, or both, was a discrete act of discrimination and did not contribute to Plaintiff's alleged hostile work environment.

Moreover, even if Plaintiff *could* bring in the other incidents, they would be insufficient to constitute a hostile work environment because they lack the severity and/or frequency typically found in hostile work environment claims that pass muster.  For example, Plaintiff's second alleged claim of hostility is that her then boyfriend was not allowed to visit her in her unit.  [ECF No. 1 ¶¶ 20-21].  The Court has trouble understanding how that can be construed as a hostile work environment, given that Corrections Officers need to concentrate on their work given the often-volatile nature of that work in prison facilities.   Plaintiff's claim that her employer insisted that she work rather date, during working hours for which she was being paid, fails to state a claim for which relief can be granted.

In another example, Plaintiff was directed to proceed from the west side of the facility to assist in the eastern portion of the facility, and her supervisor did not want to argue with Plaintiff about it.  *Id.* ¶ 23.  Again, the Court fails to see how this is severe in terms of Plaintiff's claim to a hostile working environment.  As a final example, Plaintiff received no recognition or support from Defendant after her brother died.  *Id.* ¶ 25.  While perhaps boorish or insensitive, the Court fails to see how that contributed to a discriminatory hostile working environment.

The frequency typical of hostile work environment claims is also missing.  For example, it was well over a year and a half between the first two incidents that Plaintiff complains of, the late slip Plaintiff was assessed on February 3, 2011, and the boyfriend incident on September 25, 2012.  *Id.* ¶¶ 17, 20.  As another

24

example, over two years separated Plaintiff's third and fourth alleged events, her shift from west to east sometime in 2012, and her denial of overtime on March 6, 2015. *Id.* ¶¶ 23, 24.

Plaintiff has also not alleged any conduct on Defendant's part that "is physically threatening or humiliating," *De La Cruz*, 2002 U.S. Dist. LEXIS 19922, at \*28-29, nor any that might constitute "a steady barrage of opprobrious racial comments." *Chansamone*, 523 F. App'x at 823 (quoting *Schwapp*, 118 F.3d at 110).

Allegations that have been held to constitute hostile working environments often involve repeated, severe harassment based on gender or race. *See Castagna v. Luceno*, No. 09-CV-9332 (CS), 2011 U.S. Dist. LEXIS 45567, at \*21-22 (S.D.N.Y. Apr. 26, 2011) (denying motion to dismiss hostile work environment claim when Defendant, *inter alia*, "frequently berated [Plaintiff] in front of co-workers and customers alike, . . . used sexual and ethnic slurs, and was otherwise verbally and physically abusive[,] . . . remarked that 'f women give it away' when he was displeased with a female employee's price quote, . . . remarked that there is 'nothing worse than a female Jew,' and threw a coffee mug at a female employee."); *LaGrande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 210-11 (2d Cir. 2010) (reversing grant of motion to dismiss hostile work environment claim where comments were made to Plaintiff "about black men being lazy, and about black men using white females to take care of them," where

25

Plaintiff's complaint to human resources resulted in his employer threatening termination and doubling his workload, where a company manager physically threatened him on four occasions and called him a "nigger").  Here, Plaintiff has alleged nothing coming close to these cases, and thus fails to adequately plead a hostile work environment claim.

In sum, Plaintiff's untimely allegations cannot be used to show Title VII discrimination by Defendant.  Because of that, the court agrees with Defendant that Plaintiff's "only timely [discrimination] claim that was administratively exhausted is the 2019 failure to promote claim," [ECF No. 17-1 at 7], but concludes that Plaintiff's February 2020 retaliation claim may proceed as well. Also, as discussed, Plaintiff has failed to adequately plead her allegations of hostile work environment.  Defendant's Motion to Dismiss Count One, in part, is, therefore, GRANTED-IN-PART.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss [ECF No. 17] is GRANTED-IN-PART.  Counts Two, Three, and Four are DISMISSED.  Count One is DISMISSED apart from Plaintiff's 2019 failure to promote claim and her February 2020 retaliation claim.

IT IS SO ORDERED

_____/s/_____
Vanessa L. Bryant
United States District Judg

26