UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LUZ E. SKELCHER<br>     Plaintiff, | : <br> : <br> : | <br> No. 3:21-cv-00018 (VLB) |
| v. | : <br> : | |
| DEPARTMENT OF CORRECTION,<br>STATE OF CONNECTICUT<br>     Defendant. | : <br> : <br> : <br> : <br> : <br> : | FEBRUARY 28, 2023 |

### DECISION GRANTING DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT [DKT. 34]

Plaintiff Luz E. Skelcher works as a Correction Officer for the Connecticut Department of Correction ("DOC"). In 2019, Ms. Skelcher sought a promotion to Lieutenant during a statewide initiative that began in June and ended in November. Ms. Skelcher applied for the promotion but was not one of the 52 people selected. In September 2019, a colleague who was promoted complained that Ms. Skelcher disseminated a sexually explicit image of her. After the DOC conducted an investigation and went through the union's disciplinary procedure, Ms. Skelcher was suspended for 10 days. Ms. Skelcher claims that she previously complained to a Deputy Warden of Corrigan-Radgowski Correctional Center ("Corrigan") about his failure to promote her, but she does not remember the date.

Ms. Skelcher filed this employment action on January 6, 2021. (Dkt. 1 (Compl.).) The DOC filed a motion to dismiss, which the Court granted in part. Presently before the Court is the DOC's motion for summary judgment as to the remaining claims: (1) discriminatory failure to promote on the basis of race and

gender, and (2) retaliation for complaining about the promotion process, both in violation of Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e.  For the following reasons, the motion is GRANTED.

I.  Background

The following facts comes from the parties' undisputed Local Rule 56(a) statements of fact, admitted allegations in the complaint, and the exhibits cited in the summary judgment pleadings.  The Court construes the evidence in the light most favorable to Ms. Skelcher, as the non-moving party, and draws all reasonable inferences in her favor.  *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013).

On August 20, 2004, the DOC hired Ms. Skelcher as a Correction Officer. (Dkt. 1 ¶ 11; Dkt. 28 (Ans.) ¶ 11.)  Ms. Skelcher identifies as a Hispanic female.  (*See* Dkt. 45-3 (Pl.'s Depo.) at 49:22−50:2.)  According to her, she is the only Hispanic female who worked at Corrigan during her tenure.[1]  (*Id.*)  Ms. Skelcher is a strong performer.  She received a Satisfactory or better annual review for the entirety of her employment, and since 2015 her reviews have been Excellent.  (*See* Dkt. 45-4 (Opp'n Ex. 1, Perf. Evals.).)

On October 23, 2018, the DOC posted a statewide opportunity for Correction Officers seeking promotion to Lieutenant.  (Dkt. 45-2 (Pl.'s 56(a)(2) Stmt.) ¶ 1 (posting on JobAps).)  All candidates were evaluated based on the following categories: "Performance Evaluations, Facility Evaluation, Time & Attendance, and Discipline History."  (*Id.* ¶ 4.)  For each category, the candidate received a rating of

---

[1] Corrigan is the only the prison where Ms. Skelcher was employed during the relevant time period.

"Strongly Recommended," "Recommended," "Acceptable," or "Ineligible." (*Id.*) The DOC calculated an overall rating by weighing all categories equally and then averaging the ratings. (*Id.*)  Only candidates who received an overall rating of "Strongly Recommended" were considered for "promotion at their selected facilities." (*Id.*)

Director of Human Resources, Jeffrey Miller, submitted an affidavit detailing the Lieutenant promotion process. (*See* Dkt. 34-5 (Ex. 1, Miller Aff. & Attachs.).)  In 2019, the DOC made 49 promotions. (*Id.* ¶ 14.)  A total of 685 candidates applied, but only 495 were listed as Strongly Recommended and considered. (*Id.* ¶ 13.)  Based on the candidate pool, less than 11% of those considered were promoted. (*Id.* ¶ 14.)

According to Miller, the DOC has "Affirmative Action Goals" that it considered for promotion. (*Id.* ¶ 11; *see* Dkt. 56 (Reply) at 12 n.4 (explaining Connecticut state law mandates each state agency to develop and implement an affirmative action plan).)  In 2019, the DOC's Affirmative Action Goals encompassed 27 positions: eight White males, 11 Black males, six Black Females, and two "Other" males. (*See* Dkt. 34-5 at Attach. C.)  On June 7, 2019, the DOC issued its first round of promotions and promoted 24 candidates, of which 20 satisfied the Affirmative Action Goals. (*See id.*)  During the second round of promotions on September 13, 2019, the DOC promoted 25 additional candidates, four of which satisfied the remaining Affirmative Action Goals. (*See id.* at Attach. A.)  On November 19, 2019, the DOC selected three more candidates in its last round of promotions. (*See id.* at Attach. B.)  Putting aside the individuals who

satisfied the Affirmative Action Goals, the demographics of the remaining promoted candidates are: seven White males, seven White females, two Black males, one Black female, six Hispanic males, and four Hispanic females.  (*See id.* at Attachs. A-C.)

Within Corrigan where Ms. Skelcher worked at the time, the DOC promoted 13 Correction Officers to Lieutenant.  (*See id.*)  The demographics of these individuals are: two White females, five White males, one Black female, two Black males, two Hispanic males, and one "Other" male.  (*See id.*)  Ms. Skelcher submitted an interrogatory response stating that eight of these individuals were hired after her.[2]  (Dkt. 45-5 (Opp'n Ex. 2, Interrog. Responses) at Interrog. 4.)

The parties have presented conflicting evidence on whether the DOC conducted Lieutenant candidate interviews.  HR Director Miller states that the DOC did not conduct interviews.  (*Id.* ¶ 8.)  Ms. Skelcher testified to the contrary: "Everybody was talking about it at work that the other employees received a formal interview with these captains and deputy warden.  And I was a bit shocked because I didn't receive it."  (Dkt. 45-3 at 46:13-24.)  Ms. Skelcher could not recall who told her.  (*See id.*)

After the second round of promotions and before the third, the DOC received a complaint that Ms. Skelcher sexually harassed a female co-worker who had been

---

[2] The DOC argues Ms. Skelcher's interrogatory response is inadmissible, because she lacks personal knowledge.  (*See* Dkt. 56 at 19.)  Ms. Skelcher did not clarify the basis on which she learned this information, although during her deposition she testified she "helped train most of them."  (*See id.*; Dkt. 45-3 at 75:23−76:5.)  In any event, the promotion metrics were "Performance Evaluations, Facility Evaluation, Time & Attendance, and Discipline History."  (Dkt. 45-2 ¶ 4)  Assuming the hire date falls within "Time & Attendance," it is not the only factor the DOC considered.

promoted to Lieutenant, in violation of the Office of Policy and Management's Acceptable Use Policy.  (*See* Dkt. 45-2 ¶¶ 25–26.)  Specifically, Ms. Skelcher was accused of "disseminating an image of her [co-worker] performing a sexual act on a superior with a comment about performing that act to obtain her promotion" and of having "comments on [her] personal Facebook page about this image."  (*Id.* ¶ 26.)  The DOC commenced an investigation.  (*Id.* ¶¶ 30−31.)

Following the investigation, the DOC held a pre-disciplinary hearing where Ms. Skelcher was represented by her union.  (*Id.* ¶ 31.)  The pre-disciplinary hearing resulted in a recommendation of a ten-day suspension for violating Administrative Directive 2.2 on Sexual Harassment, Administrative Directive 2.17 on Employee Conduct, and Administrative Directive 2.26 on Social Media.  (*See id.* ¶ 29.)  Ms. Skelcher filed a labor grievance challenging the suspension, which was denied.  (*Id.* ¶ 34.)  To date, she has not served her suspension nor has her grievance proceeded to arbitration.  (*Id.*)

Ms. Skelcher contends this suspension is retaliation, because she questioned Deputy Warden Cotta about the promotions made in September 2019.  (*Id.* ¶ 38.)  She could not recall the date or time period when she complained.  (*See* Dkt. 45-3 at 41:1−25.)

II.   <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  *See Vivenzio v. City of Syracuse*, 611 F.3d

98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id*. (citing *Liberty Lobby*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed—such as where the evidence offered consists of conclusory assertions without further support in the record—summary judgment may lie. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

### III.     Discussion

Courts analyze employment discrimination claims with the "now-familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Kovaco v. Rockbestos-Suprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016).

The *McDonnell Douglas* framework has three steps.  First, it requires the plaintiff to establish a *prima facie* case of discrimination, *see McDonnell Douglas*, 411 U.S. at 802, of which the elements vary for each type of claim.  The Second Circuit has noted that the burden to establish a prima facie case is "minimal" or "de minimis." *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

Second, if the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action.  *See McDonnell Douglas*, 411 U.S. at 802.  The defendant need only proffer, not prove, the existence of a nondiscriminatory reason for its employment decision.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981).  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves*, 530 U.S. at 142 (internal quotations omitted).

Third, if the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason offered by the defendant is mere pretext for illegal employment discrimination.  *See McDonnell Douglas*, 411 U.S. at 804.  "Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

### A. Failure to Promote

Ms. Skelcher claims that the DOC's failure to promote her is based on her status as a Hispanic female. While her claim—commonly known as a "gender plus" claim—is rooted in the intersectionality of her sex and race identities, it is functionally equivalent to a Title VII based on one protected category. The Second Circuit explained why in *Back v. Hastings on Hudson Union Free School District*: "The term 'sex plus' or 'gender plus' is simply a heuristic. It is, in other words, a judicial convenience developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against . . . ." 365 F.3d 107, 118–19 (2d Cir. 2004); *see also Murray v. Town of Stratford*, 996 F. Supp. 2d 90 (D. Conn. 2014) (applying "gender plus" principle to a "gender plus race" Title VII claim). The central question, therefore, is whether the DOC's failure to promote Ms. Skelcher was based on either of her two protected classes, gender and race.

To start, the backdrop of this dispute concerns the DOC's use of an Affirmative Action Plan to promote the correction officers. All Connecticut agencies that employ more than 25 people (such as the DOC) are statutorily mandated to "develop and implement, in cooperation with the Commission on Human Rights and Opportunities, an affirmative action plan" that commits the agency "to provide equal employment opportunities" in accordance with the applicable laws. Conn. Gen. Stat. 46a-68(a) (requiring affirmative action plan to

comply with "the provisions of sections 4-61u to 4-61w, inclusive, sections 46a-54 to 46a-64, inclusive, section 46a-64c and sections 46a-70 to 46a-78, inclusive."). The DOC conducted its 2019 Lieutenant promotion process according to its Affirmative Action Plan approved by the CHRO. (*See* Dkt. 56 at 12−13.)

Neither party submitted the Affirmative Action Plan as evidence. But Ms. Skelcher does not challenge the validity of the Affirmative Action Plan. Nor does she bring a disparate impact claim, which could in theory require review of the plan. Accordingly, the Affirmative Action Plan is relevant only to the extent that it was a part of the promotion process for which she claims she was disparately treated.

Turning to Ms. Skelcher's discriminatory treatment claim, she bears the burden to establish the *prima facie* elements: "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004); *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 151 (2d Cir. 2012) (citing *Feingold* standard in failure to promote claim). The DOC concedes all elements but the fourth.

The DOC argues that Ms. Skelcher cannot establish discriminatory intent for two main reasons. First, the 2019 promotion process was highly competitive, resulting in promotion for less than 11% of the Strongly Recommended candidates. While Ms. Skelcher was "Strongly Recommended" and considered for the promotion, she was not deemed superior to other candidates. Second, the DOC

9

followed the Affirmative Action Plan, which did not prioritize promoting Hispanic females. Still, the DOC hired four Hispanic females.[3]

Ms. Skelcher portrays the evidence differently. She first focuses solely on Corrigan, taking issue with the fact the DOC "promoted *every other* race/gender combination" other than Hispanic female (of which she was the only one). (*See* Dkt. 45-1 (Opp'n Mem.) at 13−14 (emphasis in original).) She then zooms out to the statewide promotion on June 7, 2019, and argues the DOC's failure to promote any Hispanic females for the 24 open positions establishes discriminatory intent. (She does not take issue with the second round of promotions in September 2019 in which four Hispanic females were selected.)

The Court will address the statewide evidence first. As an initial matter, the Court notes that the vast majority of the June 7, 2019, promotions accomplished the Affirmative Action Goals, which did not include Hispanic females. (*See* Dkt. 34-5 (Attach. C).) By the end of the 2019 promotion process, the DOC met all of its Affirmative Action Goals and then also promoted the following: seven White males, seven White females, two Black males, one Black female, six Hispanic males, and four Hispanic females. (*See id.* at Attachs. A-C.) These promotions do not raise any inference of discrimination against Hispanic females or Ms. Skelcher.

As for Ms. Skelcher's Corrigan-specific argument, the Court finds that it fails to establish an inference of discriminatory intent. As the DOC points out, Ms. Skelcher failed to do any discovery on her comparators. (*See* Dkt. 34-2 (Def.'s Mot. Summ. J. Mem.) at 1.) Therefore, Ms. Skelcher's opinion that the DOC acted with

---

[3] Overall, the DOC promoted 16 female candidates and nine Hispanic candidates. (*See* Dkt. 34-3 (Def.'s 56(a)(1) Smt.) at 11 (citing Dkt. 34-5 at Attachs. A-C).)

10

discriminatory intent is speculative. *See generally Soule by Stanescu v. Connecticut Assoc. of Schs., Inc.*, 57 F.4th 43, 52 (2d Cir. 2022) (explaining plaintiff could only speculate as to employer's subjective decision). While Ms. Skelcher had excellent performance evaluations and a 15-year tenure, (*see* Dkt. 34-5 at 49:22−50:2, Dkt. 45-4), she has not presented any evidence establishing that the individuals outside of her protected class who received the promotion were unqualified or otherwise inferior candidates. Quite the opposite. The evidence establishes that everyone promoted was Strongly Recommended, just like Ms. Skelcher. (*See* Dkt. 34-5.) Candidates were rated based on their "Performance Evaluations, Facility Evaluation, Time & Attendance, and Discipline History." (*Id.*) It is well-established that an employer "is entitled to arrive at a subjective evaluation of a candidate's suitability for a position." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 106 (2d Cir. 2001), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e).

In any event, the law in the Second Circuit is: "federal antidiscrimination law does not require that the candidate whom a court considers most qualified for a particular position be awarded that position; it requires only that the decision among candidates not be discriminatory." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 614 (2d Cir. 2016) (internal quotation marks removed). The context of *Village of Freeport v. Barella* matters—the case involved a white Italian American man who alleged the Village of Freeport mayor, a Black man, unlawfully hired a "less-qualified Hispanic candidate" as chief of police instead of him. *See id.* at 598. The mayor sought to diversify the police department's all-white "command staff" and

create a "vision of community unity." *Id.* at 599. Unlike the plaintiff who did not know the mayor and did not live in Freeport, the Hispanic candidate had known the mayor for 25 years, was a Freeport resident, and would be the first Hispanic police chief. *See id.,* 599, 614. Although the plaintiff had a higher level of education and scored higher on the promotional exam, the Hispanic candidate was chosen.

The Court is troubled by the fact that the Second Circuit, in dicta, stated, "To put it bluntly: neither § 1981 nor Title VII forbids favoritism, nepotism, or cronyism, so long as it is not premised on animus against a protected class." *Id.* at 613. While the Court recognizes this is the law of the Circuit, the Court is troubled, because *Village of Freeport* could be misused. In this Court's view, the chief of police chose the more qualified candidate. That is, in furtherance of the chief of police's vision for the department, he concluded the Hispanic candidate's intangible, inherent, intuitive qualities made him the superior candidate.

Concluding that favoritism, nepotism and cronyism are acceptable bases for employment decision-making fosters impermissible discrimination. The Court invites consideration of the following: given the history of this country—a nation built on slavery and segregation—nepotism and favoritism are, at their core, rooted in racism and discrimination. While our nation is more diverse than before, we remain a segregated society. Neighborhoods are segregated, a fact that is particularly true for white people who, on average, live in communities that are 71% white. *See* William Frey, *Even as metropolitan areas diversify, white Americans still live in mostly white neighborhoods*, BROOKINGS (Mar. 23, 2020) available at https://www.brookings.edu/research/even-as-metropolitan-areas-diversify-white-

americans-still-live-in-mostly-white-neighborhoods/ (last visited Feb. 28, 2023). Familial wealth is stratified by race; as of 2019, Black families' wealth amounted to less than 15% that of white families, and white families were significantly more likely to pass along inheritances than any other race. *See* Neil Bhutta et al., *Disparities in Wealth by Race and Ethnicity in the 2019 Survey of Consumer Finances*, BD. OF GOVERNORS OF THE FED. RESERVE SYS. (Sept. 28, 2020), available at https://www.federalreserve.gov/econres/notes/feds-notes/disparities-in-wealth-by-race-and-ethnicity-in-the-2019-survey-of-consumer-finances-20200928.html (last visited Feb. 28, 2023). Individuals tend to develop friendships and marry within their own race—"relatively few adults say they have a lot in common with those who don't share their own racial background." Kim Parker et al., *Race and Social Connections--Friends, Family and Neighborhoods*, PEW RESEARCH CTR. (June 11, 2015), available at https://www.pewresearch.org/social-trends/2015/06/11/chapter-5-race-and-social-connections-friends-family-and-neighborhoods/ (last visited Feb. 28, 2023). It is clear that the social progress envisioned by our civil rights leaders remains elusive. *See* Rachel A. Spector, *"Dignified Jobs at Decent Wages": Reviving an Economic Equity Model of Employment Discrimination Law*, 36 Berkeley J. Emp. & Lab. L. 123, 141 (2015) (explaining that despite the passage of the Civil Rights Act of 1964 "much has stayed the same over the past fifty years, such as stubbornly persistent racial disparities in income, wealth, employment, and economic mobility, particularly between blacks and whites.").

Arbiters of the law should not be fooled into believing that favoritism, nepotism, and cronyism can be separated from unlawful bias. They cannot. Take the service industry, for example.

> Racial and gender stratification in the service sector is driven by several factors: an emphasis on appearance and 'soft skills' that allows stereotypes and unconscious bias to influence hiring decisions, informal hiring practices relying on racial and ethnic-based social networks, and the absence of any internal promotion structures that would enable workers to move up the ladder over time.

Spector, *Dignified Jobs*, *supra*, at 145. At the other end of the job spectrum, consider the elite job market. "Competitive and lucrative fields are still overwhelmingly dominated by well-off white men who benefit most from recruitment practices that privilege candidates with access to established elite networks." Austin Howard, *Networking Away the American Dream: How Reinterpreting Title VII Can Reduce Employer Reliance on Exclusive Networks in Hiring and Broaden Access to Professional Opportunity*, 41 Cardozo L. Rev. 721, 727−28 (2019). After all, "[n]etworking has its historical roots in overtly racist and sexist hiring practices—the type of exclusionary practices that equal employment opportunity laws were created to address." *Id.* at 726. Courts have said that choosing a candidate who is a "better fit" can be evidence of discriminatory intent. *See, e.g., Abrams v. Dep't of Public Safety*, 764 F.3d 244, 253 (2d Cir. 2014) ("[T]he phrasing 'better fit' or 'fitting in' *just might* have been about race; and when construing the facts in a light most favorable to the non-moving party, those phrases, even when isolated, could be enough to create a reasonable question of fact for the jury.") (emphasis in original). In a society rooted in segregation and "sameness," favoritism, nepotism, and cronyism can easily be used as a surrogate

to perpetuate the "better fit." As a consequence, if we permit decisions to be made on the basis of favoritism, nepotism, and cronyism we will give a tacit license to discriminate—the very thing that Title VII and *Village of Freeport* is designed to eliminate.

As for pretext, Skelcher relies on her *prima facie* case evidence. She suggests—without providing any evidence—that the DOC failed to follow its Affirmative Action Plan. (*See* Dkt. 45-2 at 18.) To the contrary, the evidence establishes the DOC satisfied the Affirmative Action Goals and then hired additional candidates in a manner that suggests Hispanic females were not disparately treated. Ms. Skelcher also takes issue with the fact that neither Hispanic males nor Hispanic females were included as Affirmative Action Goals. As the Supreme Court explained in *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 642 (1987), an employer may consider a candidate's protected status "as one factor" among many under an affirmative action plan. "Such a plan is fully consistent with Title VII, for it embodies the contribution that voluntary employer action can make in eliminating the vestiges of discrimination in the workplace." *Id.* It would be wholly speculative to assume Hispanic males and Hispanic females should be Affirmative Action Goals, because Ms. Skelcher does not provide any factual or statistical basis to conclude they are underrepresented in the Lieutenant job category. Absent additional evidence, a reasonable jury would not find that the DOC discriminated against Ms. Skelcher when it failed to promote her in 2019. For these reasons, summary judgment is GRANTED.

### B. Retaliation

The parties do not dispute the facts relevant to Ms. Skelcher's retaliation case. That is, on September 19, 2019, the DOC received a complaint that Ms. Skelcher disseminated an image of a coworker—who had recently been promoted to Lieutenant—"performing a sexual act on a superior with a comment about performing that act to obtain her promotion" and commented on her personal Facebook page about the image. (Dkt. 45-2 ¶ 26.) The DOC commenced an investigation, held a pre-disciplinary hearing, and, on September 28, 2020, recommended a ten-day suspension for violating three Administrative Directives (2.2, Sexual Harassment; 2.17, Employee Conduct; and 2.26, Social Media). (*Id.* ¶¶ 26−33.) On October 20, 2020, Ms. Skelcher filed a grievance of the ten-day suspension, which was denied. (*Id.* ¶ 34.) Ms. Skelcher claims this suspension was retaliation against her questioning Deputy Warden Cotta about promotions. (*Id.* ¶ 38.) She claims that her husband was investigated for the same incident but not disciplined. (*See id.* ¶ 41.)

While the parties do not dispute the facts, they dispute whether Ms. Skelcher's protected activity—complaining about discrimination to Deputy Warden Cotta—is causally connected to her suspension. *See Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010) (explaining there must be "a causal connection between the protected activity and the adverse employment action"). The DOC argues the two events are too attenuated, because the time period between Ms. Skelcher's protected activity and her <u>suspension</u> is 11 months. (*See* Dkt. 34-2 at 16.) Ms. Skelcher, on the other hand, calculates the temporal proximity as "nearly

16

immediately" insofar as the DOC began its <u>investigation</u> shortly after she complained to Deputy Warden Cotta.

When the DOC received a complaint that Ms. Skelcher was sexually harassing another employee, it acted properly by commencing an investigation. "Employers are under an independent duty to investigate and curb … harassment by lower level employees of which they are aware." *Cox v. Onondaga County Sheriff's Department*, 760 F.3d 139, 149 (2d Cir. 2014). As the Second Circuit explained:

> [W]e cannot blind ourselves to the fact that an employer's failure to conduct an investigation when faced even with an internal complaint … might be viewed as evidence of an indifference to … discrimination, if not acquiescence in it. Indeed, we can say with confidence that the law must give breathing room for such investigations to be carried out.

*Id.* at 146. After conducting the investigation, the DOC concluded that Ms. Skelcher violated several policies. "If the employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity." *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008); *see Cox*, 760 F.3d at 148 (favorably citing *Richey*'s "good faith" principle). The fact Ms. Skelcher also complained about the DOC's failure to promote her does not insulate her from consequences for violating her employer's policies.

This situation is distinguishable from circumstances in which the investigation itself is retaliatory. For example, an investigation may "constitute a cognizable retaliatory action if carried out so as to result in hostile work environment, constructive discharge, or other employment consequences of a

17

negative nature, or if conducted in such an egregious manner as to 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Cox*, 760 F.3d at 146 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)); *Ulrich v. Soft Drink, Brewery Workers & Delivery Employees, Industrial Employees, Warehousemen, Helpers & Miscellaneous Workers, Greater New York and Vicinity, Local Union No. 812, et al.*, 425 F.Supp.3d 234, 424 (S.D.N.Y. 2019) (denying motion to dismiss where plaintiff alleged suspension based on a "procedurally flawed investigation"). Here, Ms. Skelcher does not question the motives of the complainant. She admits to viewing the sexually explicit image, and she admits it was posted on her Facebook page. (*See* Dkt. 45-3 at 56:7−25.) While she denies posting the image, she tacitly admits to having done so because she acknowledged no one had access to her Facebook account but her. (*See id.*) Because it is undisputed that an image of a superior and a subordinate engaging in sexual activity was posted on her Facebook page and the subordinate complained to the DOC, the Court finds that the DOC acted reasonably in initiating an investigation.

Ms. Skelcher has not submitted any other evidence of retaliatory intent. Accordingly, summary judgment is GRANTED as to the retaliation claim.

* * *

IV.     **Conclusion**

For the above reasons, the Court GRANTS summary judgment for Defendant on the failure to promote and retaliation claims.  The Clerk is ordered to close this case.

                                              **IT IS SO ORDERED**

                                              _____

                                              Hon. Vanessa L. Bryant
                                              United States District Judge

**Dated at Hartford, Connecticut: February 28, 2023**